J-E01005-17

2017 PA Super 157

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MOLLY HLUBIN | |
| Appellant | No. 951 WDA 2015 |

Appeal from the Judgment of Sentence May 21, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0003205-2014

BEFORE: BENDER, P.J.E., BOWES, J., PANELLA, J., SHOGAN, J.,
LAZARUS, J., OLSON, J., DUBOW, J., MOULTON, J., and
SOLANO, J.

OPINION BY LAZARUS, J.:                                   **FILED MAY 23, 2017**

Molly Hlubin appeals from the judgment of sentence, entered in the
Court of Common Pleas of Allegheny County, following her conviction of two
counts of driving under the influence (DUI).[1]  After careful review, we affirm.

The trial court aptly set forth the facts[2] of the underlying case as
follows:

_____

[1] 75 Pa.C.S. § 3802(a)(1) (general impairment); 75 Pa.C.S § 3802(b) (high
rate of alcohol; having BAC of 0.10% to less than 0.16%).

[2] The parties stipulated that the following exhibits were included as part of
the certified record for purposes of reargument:

  • Exhibit 1 – West Hills DUI Task Force Policy and Procedural Guidelines
  • Exhibit 2 – an unsigned sobriety checkpoint authorization form

*(Footnote Continued Next Page)*

[O]n September 29, 2013, police officers from the West Hills DUI Task Force [("Task Force")] conducted a sobriety checkpoint on Steubenville Pike in Robinson Township, Pennsylvania. The Task Force is comprised of municipal police officers from fifteen (15) jurisdictions in the western portion of Allegheny County, Pennsylvania, including Robinson Township and Moon Township. After the conclusion of the Suppression Hearing, the Commonwealth filed a Motion to Reopen the Record and Admit New Evidence [it] could introduce, as Exhibit 4, Robinson Township's Resolution 14-2003 that authorized [its] participation in the [Task Force]. This [c]ourt granted that request on May 21, 2015.

At the Suppression Hearing, the Commonwealth presented testimony of Sergeant Douglas Ogden, who is a Patrol Sergeant with the Moon Township Police Department. Sergeant Ogden has been with the Moon Township Police Department since 1996 and has been in law enforcement since 1989. Sergeant Ogden is the Program Coordinator and Project Manager for the [Task Force]. In addition to administrative tasks such as applying for grants and managing statistics, Sergeant Ogden organizes the checkpoints and road patrols and conducts training for the officers involved in checkpoints and DUI enforcement and detection. Sergeant Ogden testified that his statistical analysis showed that most of the DUI arrests and crashes in Robinson Township occurred at Steubenville Pike. The [Task Force] has policies in place to identify target locations for DUI checkpoints, which [were] admitted into evidence as Commonwealth's Exhibit 1. The [Task Force] Policy and Procedural Guidelines require that the grant coordinator, or his designee, be present at all DUI checkpoints.

Sergeant Ogden testified that he requested a DUI checkpoint from September 28, 2013 at 11[:00] p.m. through September 29, 2013 at 4:00 a.m. to coordinate with the ending time of a

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

- Exhibit 3 – a signed sobriety checkpoint authorization form
- Exhibit 4 – a Robinson Township Resolution
- Exhibit 5 – The blood test results from the county of Allegheny Office of the Medical Examiner.

Agreed Stipulation to Supplement the Appellate Record, 1/6/17, at 3.

concert at the Star Amphitheater because historically Robinson Township has difficulty with drunk drivers following concerts at that venue. On September 23, 2013, Robinson Township Police authorized this DUI checkpoint. Thereafter, Sergeant Ogden sent out the required press releases and the request for manpower. At the time the checkpoint begins, Sergeant Ogden and the officer in charge assign officers from each municipality specific tasks with the officers from the home agency who are qualified to administer DUI Field Sobriety Tests being assigned to the testing area. Generally, Sergeant Ogden, as grant coordinator, is in the area of the DUI trailer and testing area assisting officers there, however, he also can fill in where needed when manpower is depleted.

Sergeant Ogden was present at the September 28, 2013 DUI checkpoint on Steubenville Pike in Robinson Township. At 12:25 a.m., he was filling in on the road because the line had become depleted of manpower. At this time, he came into contact with [Hlubin], who was the driver of a vehicle. After introducing himself, Sergeant Ogden asked for her driver's license, registration, and proof of insurance. [Hlubin] initially handed him her Target credit card. While [Hlubin] was obtaining her documentation, Sergeant Ogden noticed an odor [of] alcoholic beverages coming from the vehicle and that [Hlubin] had slurred speech. In addition, [Hlubin] admitted that she had a shot and a beer. Sergeant Ogden then escorted her to the testing area, explained the testing procedure, and handed her over to Officer Sicilia of the Robinson Township Police Department. Thereafter, Sergeant Ogden had no direct contact with [Hlubin].

Officer Dominic Sicilia, a police officer with Robinson Township, testified that he was working the testing area in the DUI checkpoint on Steubenville Pike in Robinson Township on September 28-29, 2013. He further testified that he came into contact with [Hlubin] while he was working the checkpoint. He testified that he explained that she was going to be asked to perform three field sobriety tests:  the HGN[3] test, the walk-

---

[3] This test is known as the Horizontal Gaze and Nystagmus (HGN) test. Nystagmus is the rhythmic oscillation of the eyeballs in either a horizontal, vertical, or rotary direction. *See **Commonwealth v. Miller***, 532 A.2d 1186, 1188 (Pa. Super. 1987).  Officers use this test to ascertain the
*(Footnote Continued Next Page)*

and-turn test, and the one-legged stand test. [Hlubin] was given instructions on how to perform each test prior to administration of the test, and understood the directions. With regard to the HGN test, Officer Sicilia was looking for six (6) clues, and observed all six (6) clues. Further, [Hlubin] exhibited two (2) out of eight (8) clues for the walk-and-turn test. [Hlubin] exhibited one (1) out of four (4) clues for the one-legged stand test. Based upon his experience with intoxicated persons, his training as a police officer, the information provided by Sergeant Ogden, and his interaction with [Hlubin], Officer Sicilia formed an opinion that [Hlubin] was incapable of safely operating a motor vehicle. Thereafter, [Hlubin] consented to a blood draw, and was found to have a blood alcohol content of .152%.

Trial Court Opinion, 1/5/16, at 2-5 (internal citations omitted).

Hlubin was charged with the aforementioned two counts of DUI. On March 9, 2015, Hlubin filed a pre-trial motion to suppress, alleging that the sobriety checkpoint was unconstitutional and that everything that flowed from the illegal stop should be suppressed.[4] The court denied the motion and the matter proceeded to a bench trial before the Honorable Thomas E. Flaherty. At trial, Hlubin and the Commonwealth stipulated to the admission of the testimony of Officer Sicilia and Sergeant Ogden from the suppression hearing, as well as the results of Hlubin's blood test. Following trial, the court convicted Hlubin on both DUI counts and sentenced her to thirty days

_(Footnote Continued)_ ⸻

horizontal gaze nystagmus of a motor vehicle driver suspected of driving under the influence of alcohol. ***Id.***

[4] In her suppression motion, Hlubin also claimed that the implied consent law was violated when her blood was not drawn at an approved facility, probable cause did not exist to arrest her for suspected DUI, and Sergeant Ogden did not have the authority to detain and arrest her outside of his jurisdiction.

of Restrictive Intermediate Punishment, six months of non-reporting probation, and fines.

Hlubin filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal. A panel of this Court affirmed the trial court's judgment of sentence. ***See Commonwealth v. Hlubin***, 951 WDA 2015 (Pa. Super. filed Oct. 6, 2016) (unpublished memorandum decision). However, that decision was later withdrawn after our Court granted reargument on December 15, 2016. The parties filed new briefs. On reargument, Hlubin presents the following issues for our consideration:

> (1) Did the trial court err when it ruled that the checkpoint, which led to [Hlubin's] stop, detention, and arrest, was lawful even though the Commonwealth failed to show compliance with the Intergovernmental Cooperation Act [("ICA")]?
>
> (2) Did the trial court err when it held that Section 8953(a)(3) [of the Municipal Police Jurisdiction Act [("MPJA")]] permits officers to leave their primary jurisdiction for the purpose of participating in a sobriety checkpoint?
>
> (3) Whether or not Officer Sicilia had sufficient probable cause to arrest [Hlubin] for the offense of DUI and to request a chemical test?

A. Validity of Sobriety Checkpoint and the ICA

Pursuant to the ICA:

> (a) General rule. — Two or more local governments in this Commonwealth may jointly cooperate, or any local government may jointly cooperate with any similar entities located in any other state, in the exercise or in the performance of their respective governmental functions, powers or responsibilities.

(b)  Joint agreements. — For the purpose of carrying the provisions of this subchapter into effect, the local governments or other entities so cooperating shall enter into any joint agreements as may be deemed appropriate for those purposes.

53 Pa.C.S. § 2303 (emphasis added).  Under section 2305 of the ICA, a local government may enter into any intergovernmental cooperation with another local government upon the passage of an ordinance of its governing body. *Id.* at § 2305.  In such cases, ordinances shall contain seven specific criteria outlined in section 2307 of the ICA.[5]

The Commonwealth concedes, and we agree, that the DUI checkpoint in the instant case did not comply with the ICA where the 15 municipalities

_____

[5] The seven criteria are:

(1)  The conditions of agreement in the case of cooperation with or delegation to other local governments, the Commonwealth, other states or the Federal Government.

(2)  The duration of the term of the agreement.

(3)  The purpose and objectives of the agreement, including the powers and scope of authority delegated in the agreement.

(4)  The manner and extent of financing the agreement.

(5)  The organizational structure necessary to implement the agreement.

(6)  The manner in which real or personal property shall be acquired, managed, licensed or disposed of.

(7)  That the entity created under this section shall be empowered to enter into contracts for policies of group insurance and employee benefits, including Social Security, for its employees.

53 Pa.C.S. § 2307.

comprising the Task Force did not jointly cooperate by each adopting an ordinance in compliance with sections 2303 and 2305. **See** 53 Pa.C.S. § 2315 (joint cooperation agreement deemed in force when it has been adopted by ordinance by cooperating local governments). While Robinson Township had proposed a resolution to participate with the Task Force, that resolution was not ratified and adopted by the other Task Force municipalities nor does it contain the required criteria of an ordinance under section 2307. **See supra** note 6. However, this does not end our inquiry with regard to whether the checkpoint was otherwise valid.

B.  Constitutionality/Legality of Sobriety Checkpoint and the MPJA[6]

Hlubin claims that because the ICA codifies the process that local governmental units must follow when cooperating with each other "it controls the outcome of this case as well as the legality of all sobriety checkpoints (and all government matters) when the officers from outside the primary jurisdiction are utilized." Appellant's Brief, at 31. Moreover, she contends that "[o]nce it is shown that the Commonwealth failed to comply with the ICA, the trial court's decision that the checkpoint at issue was legally constituted must be reversed [or] Article IX, § 5 of the Pennsylvania Constitution and the ICA are rendered meaningless." **Id.** We disagree.

_____

[6] 42 Pa.C.S. §§ 8951-8954.

As the Commonwealth notes, while the relevant sections of the local government code apply to "all local governments,"[7] 53 Pa.C.S. § 2301, the MPJA only applies to any "duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction." 42 Pa.C.S. § 8953(a). Specifically, the MPJA enumerates a discrete set of circumstances under which a municipal police officer may exercise extra-territorial authority. *See generally* 42 Pa.C.S. § 8953(a)(1)-(6). Accordingly, we do not agree with Hlubin's claim that Article IX, § 5 of the Pennsylvania Constitution and the ICA will be "rendered meaningless and municipal boundaries will be obliterated" by applying the MPJA in such limited circumstances as the present case. These two statutes can be applied concurrently; they are not mutually exclusive as they address different circumstances that may arise within local municipalities. *See* 1 Pa.C.S. § 1933 (whenever general provision in statute shall conflict with

_____

[7] Under the ICA, "local government" is defined as:

> A county, city of the second class, second class A and third class, borough, incorporated town, township, school district or any other similar general purpose unit of government created by the General Assembly after July 12, 1972.

53 Pa.C.S. § 2302.

special provision in same or another statute, two shall be construed, if possible, so that effect may be given to both).[8]

Hlubin also contends she was not lawfully arrested because the sobriety checkpoint was not authorized under the MPJA. Specifically, Hlubin asserts that the MPJA relates only to situations where a request for assistance is *contemporaneous* with the commission of a crime and that probable cause to believe a crime is being or has been committed is the fundamental purpose of the MPJA.

Section 8953(a) of the MPJA delineates six specific situations wherein an officer can go outside of his or her primary jurisdiction to make arrests, serve warrants and perform other official functions. *See* 42 Pa.C.S. § 8953(a)(1)-(6). Pursuant to section 8953(a) of the MPJA:

> (a)  General rule. — Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases:
>
> \*   \*   \*
>
> (3)  Where the officer has been requested to aid or assist any local, State or Federal law enforcement officer or park

---

[8]  Moreover, the extent that Hlubin raises concerns with regard to expenditures, allocation of personnel, decisions regarding participation in programs and liability issues if the MPJA were applied in circumstances like the present, those matters are not before the court today.

police officer or otherwise has probable cause to believe that the other officer is in need of aid or assistance.

(4) Where the officer has obtained the prior consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which provides primary police services to a political subdivision which is beyond that officer's primary jurisdiction to enter the other jurisdiction for the purpose of conducting official duties which arise from official matters within his primary jurisdiction.[9]

42 Pa.C.S. § 8953(a)(3), (4). The MPJA is not among those statutes which must be strictly construed and, instead, is subject to liberal construction to effectuate its objects and to promote justice. *Commonwealth v. Peters*, 915 A.3d 1213 (Pa. Super. 2007).

One of the principal purposes of the MPJA is to promote public safety while placing a general limitation on extra-territorial police patrols. *Commonwealth v. Merchant*, 595 A.2d 1135, 1138 (Pa. 1991). In fact, one of the main objectives of the MPJA is to "promote a cohesive working relationship among municipal police departments." *Commonwealth v.*

_____

[9] Although we ultimately conclude that Sergeant Ogden had the authority to stop Hlubin under section 8953(a)(3) of the MPJA, we also recognize that he may have been authorized to conduct the stop under section 8953(a)(4) where he had been given the consent of Robinson Township Police Chief Vietmeier to conduct official duties in Allegheny County as a member of the Task Force executing a joint DUI checkpoint. We also acknowledge the relevancy of section 8953(e) of the MPJA which preserves existing and future municipal police service agreements. *See* 42 Pa.C.S. § 8953(e) ("Nothing in this section shall be construed to restrict the authority of any municipality to maintain current or to enter into new cooperative police service agreements with another municipality or municipalities for purposes including, but not limited to, describing conditions of mutual aid, assigning liability and determining appropriate costs of these cooperative efforts.").

*Ebersole*, 492 A.2d 436, 439 (Pa. Super. 1985). *See Commonwealth v. Sestina*, 546 A.2d 109 (Pa. Super. 1988) (the MPJA "not only encourages cooperative relationships among municipalities, but also between local municipalities and the state police;" statute addresses administrative, intra-departmental practice for state police).

Instantly, the trial court found that the roadblock, operated as part of the Task Force, was a valid exercise of authority under section 8953(a)(3) of the MPJA. Program coordinator and project manager for the Task Force, Sergeant Douglas Ogden, testified that the Task Force was comprised of 15 police departments that "bonded together to do DUI enforcement." N.T. Suppression Hearing, 3/13/15, at 9. Each year Sergeant Ogden applies for a grant and gathers statistics to support the administration of the grant; the statistics compiled DUI-related crashes, fatalities, and a list of the most common local roadways where DUI crashes occur. *Id.* at 10. Sergeant Ogden runs checkpoints, road patrols, and training for the officers involved in the checkpoints, as well as for those officers who are responsible for DUI enforcement and detection. *Id.* Sergeant Ogden also testified that he has two co-coordinators that assist him on the scene at an active checkpoint. *Id.* at 11. Finally, Sergeant Ogden testified that Steubenville Pike in Robinson Township, where the instant checkpoint was located, is identified as a DUI problem location as was reported to him by Robinson Township Sergeant Joel Hamilton. *Id.* at 11-12.

Sergeant Ogden testified that there were established program policies and procedural guidelines[10] associated with the Task Force that were sent to every member department. *Id.* at 14, 20 ("Every one of the members of my task force has a copy of it that I have sent and they have it at their disposal."). In this particular case, the sobriety checkpoint was headed by Sergeant Hamilton; more than 25 officers were authorized to man the checkpoint. *Id.* at 15. Sergeant Ogden sent Sergeant Hamilton a sobriety checkpoint authorization form, requesting that he have the Robinson Township police chief sign the form to authorize Ogden to be out in the road conducting the checkpoint. *Id.* at 17. Robinson Township Police Chief Dale Vietmeier returned the signed form[11] five days before the checkpoint took

_____

[10] The procedural policy and guidelines for the Task Force include the following information:

- Purpose of Task Force;
- Definition of Sobriety Checkpoint;
- Policy of the Task Force;
- Checkpoint Procedures, including Site Selection, Personnel Selection and Deployment, Training, Checkpoint Duration, and Officer Responsibilities;
- Checkpoint Tactics and Guidelines;
- Scheduling & Administrative Concerns; and
- External Support

West Hills Area DUI Task Force Sobriety Checkpoint Program: Policy and Procedural Guidelines; Commonwealth Exhibit 1.

[11] The form states:

*(Footnote Continued Next Page)*

- 12 -

place.  *Id.* at 18; Commonwealth's Exhibit 3.  Information regarding the exact location, time, officer in charge and the logistics of the checkpoint is also included in the form.  *Id.*  An email press release about the checkpoint was sent in advance to local television, radio, and print news outlets, as well as a designated mailing list.  *Id.* at 23.

Based upon this testimony, we affirm the trial court's conclusion that the instant checkpoint was valid under subsection 8953(a)(3) of the MPJA. There is no statutory language in the MPJA, specifically section 8953(a)(3), that would impose a "contemporaneous" requirement upon an officer's request for aid or assistance.  In fact, subsection 8953(a)(2), often termed the "hot pursuit" exception of the MPJA, specifically applies to those instances where an officer's chase into a neighboring jurisdiction is "immediate, continuous, and uninterrupted."  *Commonwealth v. McPeak*, 708 A.2d 1263, 1266 (Pa. Super. 1998).  Moreover, "it is noteworthy that the predecessor [of the MPJA] made provision for police action outside [an officer's] primary jurisdiction in only one circumstance, i.e., hot pursuit." *Merchant*, 595 A.2d at 1138-39.  "The inclusion of additional instances of authorization indicates that the General Assembly intended to expand the

*(Footnote Continued)* ─────────────

> I hereby authorize the operation of a sobriety checkpoint as outlined above and adhering to standard operating procedures that have been established.

West Hills DUI Task Force Sobriety Checkpoint Authorization Form, 9/23/13.

powers of local police to protect the public, where such expansion would not adversely affect the ultimate goal of maintaining police accountability to local authority." **Id.** at 1139. Thus, in light of the purpose and spirit of the MPJA, in conjunction with its liberal construction, we decline to read such a "contemporaneous" element into subsection (a)(3). **Peters**, **supra**.

Here, Robinson Township Police Chief Vietmeier and Officer-in-Charge Sergeant Hamilton authorized Sergeant Ogden, as Task Force representative, to operate the sobriety checkpoint in his jurisdiction and to "adher[e] to the standard operating procedures that have been established." West Hills Task Force Sobriety Checkpoint Authorization Form, 9/23/15. This arrangement represents Robinson Township's request for "aid and assist[ance]" from Moon Township Sergeant Ogden in carrying out a sobriety checkpoint that served the legitimate purpose of reducing death, injury and property damage resulting from motor vehicle crashes due to intoxicated or chemically impaired drivers from the surrounding municipalities.

Moreover, even if the sobriety checkpoint was not valid under the stricture of the MPJA, suppression is not warranted under the circumstances. In **Commonwealth v. O'Shea**, 567 A.2d 1023 (Pa. 1989), the Pennsylvania Supreme Court approved of a case-by-case approach, applying the following factors to determine whether suppression is warranted where evidence is obtained in violation of the MPJA: intrusiveness of the police conduct; the extent of deviation from the letter and spirit of the Act; and the prejudice to the accused. **Id.** at 1030; **see Commonwealth v. Chernosky**, 874 A.2d

123 (Pa. Super. 2005) (en banc) (concluding that where officer's action did not constitute type of behavior legislature sought to prohibit through enactment of MPJA, suppression not appropriate remedy; Court rejected absolutist approach of exclusionary rule in such cases).

Here, the police were not intrusive in detaining motorists at the checkpoint. Sergeant Ogden testified that the stops generally lasted only 30 to 45 seconds in length and involved officers first identifying themselves, asking for a driver's identifying documents (license, registration and insurance), and posing limited follow-up questions. N.T. Suppression Hearing, 3/13/15, at 26-27. The checkpoints furthered the purpose of the MPJA by "reduc[ing] the accidental death, injury and property-damage resulting from motor vehicle crashes involving intoxicated and chemically impaired operators . . . decreas[ing] the number of intoxicated and chemically impaired offenders on the highways of the member communities by conducting sobriety checkpoints." West Hills Area DUI Task Force Sobriety Checkpoint Program: Policy and Procedural Guidelines, at 2. Finally, there was minimal to no prejudice suffered by drivers stopped at the checkpoints. **See Commonwealth v. Worthy**, 957 A.2d 720, 724 (Pa. 2008) (sobriety checkpoints do not offend Fourth Amendment because they are "a reasonable means of advancing a vital public interest, involving only a modest intrusion on the privacy and liberty of motorists"); **see also Commonwealth v. Henry**, 943 A.2d 967 (Pa. Super. 2008) (where officer unintentionally failed to follow appropriate MPJA procedure after detaining

defendant and defendant was not prejudiced, evidence should not have been suppressed).

C. <u>Probable Cause to Arrest for DUI</u>

In her final issue, Hlubin asserts that Officer Sicilia did not have probable cause to arrest her for DUI. We disagree.

Probable cause for a DUI arrest is present when a police officer has sufficient facts at his disposal to warrant a prudent person to believe that the driver of a vehicle is under the influence of alcohol. ***Commonwealth v. Angel***, 946 A.2d 115 (Pa. Super. 2008). The probable cause determination is made based upon the totality of the circumstances and "a police officer may utilize both his experience and personal observations to render an opinion as to whether a person is intoxicated." ***Commonwealth v. Williams***, 941 A.2d 14, 27 (Pa. Super. 2008) (citation omitted).

Here, Sergeant Ogden testified that when he stopped Hlubin at the checkpoint and asked her for her driver's license and proof of registration and insurance, Hlubin's reaction "was slow and fumbled and she . . . started handing me a Target credit card as opposed to a driver's license." N.T. Suppression Hearing, 3/13/15, at 31. Moreover, Sergeant Ogden testified that he noticed a strong odor of alcohol coming from Hlubin's vehicle and that her speech was slurred. ***Id.*** at 32. Ultimately, Hlubin told Sergeant Ogden that "she may have had a shot and a beer." ***Id.***

Officer Sicilia, who had training in field sobriety and had conducted approximately one hundred prior DUI investigations, performed three field

sobriety tests on Hlubin at the checkpoint.  *Id.* at 60, 62.  While conducting the tests, Officer Sicilia noticed that Hlubin had bloodshot, glassy eyes and an odor of alcohol emanating from her.  *Id.* at 63.  Officer Sicilia concluded that Hlubin was impaired after she exhibited all six clues during the HGN test.  *Id.*  As a result of these findings, Officer Sicilia opined that Hlubin was incapable of driving a motor vehicle and placed her under arrest.  *Id.* at 66.

Under a totality of the circumstances, we conclude that Officer Sicilia had probable cause to arrest Hlubin for suspected driving under the influence.  75 Pa.C.S. §§ 3802(a)(1), (b); *Commonwealth v. Hilliar*, 943 A.2d 984 (Pa. Super. 2008) (holding probable cause existed to arrest driver for DUI where driver smelled of alcohol and his speech was slurred).[12]

Judgment of sentence affirmed.

_____

[12] Hlubin argues in her appellate brief that without reasonable grounds to believe that she was driving under the influence, the police were not permitted to administer a blood test under 75 Pa.C.S. § 1547(a)(1).  *See Commonwealth v. Thur*, 906 A.2d 552 (Pa. Super. 2006).  We first note that Hlubin does not raise this issue in her Pa.R.A.P. 1925(b) concise statement.  Thus, we could find the issue waived on appeal.  *See* Pa.R.A.P. 1925(b)(4)(vii).  However, even if it were not waived, because there was probable cause to arrest Hlubin for DUI, this issue is meritless.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  5/23/2017