IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 56 WAP 2017 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court entered May 23, 2017 at No. |
| | : | 951 WDA 2015, affirming the |
| v. | : | Judgment of Sentence of the Court of |
| | : | Common Pleas of Allegheny County |
| | : | entered May 21, 2015 at No. CP-02- |
| MOLLY HLUBIN, | : | CR-0003205-2014 |
| | : | |
| Appellant | : | ARGUED:  October 23, 2018 |

*Justice Donohue delivers an Opinion of the Court as to Parts I and IV, delivers an opinion as to Parts II and III joined by Justices Todd and Wecht, and announces the Judgment of the Court.*

## OPINION

**JUSTICE DONOHUE**                    **DECIDED:  MAY 31, 2019**

This discretionary appeal addresses the interplay between the Intergovernmental Cooperation Act, 53 Pa.C.S. §§ 2301–2317 (the "ICA"), and the Municipal Police Jurisdiction Act. 42 Pa.C.S. §§ 8951–8954 ("MPJA").  An en banc panel of the Superior Court ruled that Appellant Molly Hlubin's ("Hlubin") stop and arrest at a sobriety checkpoint in Robinson Township, conducted by a task force that included police officers from a number of other municipalities operating outside of their primary jurisdictions, was lawful.  According to the Superior Court, formation of the task force did not require compliance with the ICA, as the MPJA contains exceptions to the general limitation on police activities outside of an officer's primary jurisdiction.  For the reasons set forth

herein, we reverse the decision of the Superior Court. The sobriety checkpoint task force at issue required compliance with the ICA, as none of the exceptions in the MPJA authorized the extraterritorial police activities performed here.

On September 29, 2013, at approximately 12:25 a.m., Hlubin was driving along Steubenville Pike in Robinson Township when she was stopped and questioned at a sobriety checkpoint. N.T., 3/13/2015, at 30-31. Sergeant Douglas Ogden ("Sergeant Ogden") from the Moon Township police department stopped Hlubin and requested her driver's license, registration, and proof of insurance. *Id.* at 31. He detected an odor of alcohol and observed that her speech was slurred. *Id.* at 31-32. Upon questioning, Hlubin admitted that she drank a shot and a beer that night. *Id.* at 32. Sergeant Ogden then escorted Hlubin to a testing area, where Robinson Township Police Officer Dominic Sicilia took over and directed her to perform sobriety tests. *Id.* at 33. Based upon her performance and the information he learned from Sergeant Ogden, Officer Sicilia placed Hlubin under arrest for suspicion of driving under the influence ("DUI"). *Id.* at 63-67. Hlubin consented to a blood draw, which was performed by a phlebotomist stationed in a nearby trailer on site. *Id.* Based upon the results of the blood testing, she was charged with two counts of DUI.[1]

On March 9, 2015, Hlubin filed an omnibus pretrial motion asserting, inter alia, that Sergeant Ogden "was acting outside of his primary jurisdiction when he was operating a sobriety checkpoint in Robinson Township" and therefore, did not have the authority to

---

[1] 75 Pa.C.S. § 3802(a)(1) (general impairment) and 75 Pa.C.S. § 3802(b) (high rate of alcohol).

conduct the stop and detention. *See* Omnibus PreTrial Motion, 3/9/2015, at 7.[2] Hlubin maintained that the task force did not comply with the ICA and that no exceptions set forth in the MPJA permitted members of the task force to operate outside of their primary jurisdiction. She sought suppression of all evidence gathered during her unauthorized and unlawful detention and dismissal of all charges. *Id.* at 8-9.

At a suppression hearing on March 13, 2015, the Commonwealth presented evidence to show both that the task force was in compliance with the statutory requirements in the ICA and that Sergeant Ogden's presence at the checkpoint was authorized by certain exceptions in the MPJA permitting police actions outside of an officer's primary jurisdiction. The Commonwealth asserted that the task force was "set up between the police forces themselves," with "their chiefs themselves sign[ing] off" on the individual checkpoints. N.T., 3/13/2015, at 102. Sergeant Ogden testified, identifying himself as the program coordinator and project manager for the "Western PA DUI task force,"[3] a group comprised of law enforcement officers from fifteen municipal police departments and the City of Pittsburgh. As the program coordinator and project manager, Sergeant Ogden trains police officers in conducting the task force's sobriety checkpoints.

---

[2] She also asserted various issues not before us in this appeal, including that the checkpoint was constitutionally infirm in that it did not comply with the "comprehensive requirements" established in *Commonwealth v. Worthy*, 957 A.2d 720, 725 (Pa. 2008), *Commonwealth v. Tarbert*, 535 A.2d 1035 (Pa. 1987) (plurality), and *Commonwealth v. Blouse*, 611 A.2d 1177 (Pa. 1992). She also challenged the legality of the roadside blood draw, claiming that it did not occur at an "approved facility" in violation of 75 Pa.C.S. § 1547(c)(2)(i). Finally, she argued that there was not probable cause to request a chemical test.

[3] In his testimony at the suppression hearing, Sergeant Ogden referred at times to the task force as the "Western PA DUI task force" and at others, to the "West Hills DUI task force." N.T., 3/13/2015, at 9, 14.

*Id.* at 9, 14. This training adheres to procedural guidelines laid out in a manual, entitled the "West Hills DUI task force policy and procedural guidelines," which was entered into evidence. *Id.* at 14. Sergeant Ogden also testified that he annually applies for and administers a grant to fund the task force. *Id.* at 10-11.

With respect to the sobriety checkpoint on September 29, 2013, Sergeant Ogden explained that its location on Steubenville Pike in Robinson Township was selected because that area has been an "ongoing problem" when a nearby concert venue lets out. *Id.* at 11-12. In support of this contention, he cited to statistics regarding the number of DUI arrests, crashes and fatalities on that road dating back to 2008. *Id.* at 11-12. Having selected this location, Sergeant Ogden indicated that he, along with Sergeant Joel Hamilton of the Robinson Township police department, scheduled a checkpoint on the night of a concert, starting at 11 p.m. on September 28, 2013 and ending at 4 a.m. the next day. Sergeant Hamilton and Robinson Township Police Chief Dale Vietmeier ("Chief Vietmeier") signed a "sobriety checkpoint authorization form," which the Commonwealth entered into evidence, that purported to "authorize the operation of a sobriety checkpoint" in adherence with the task force's "standard operating procedures." *Id.* at 19. Sergeant Ogden also signed the form. *Id.* at 20. Following the suppression hearing, the Commonwealth sought to reopen the record to admit into evidence a 2003 resolution signed by the township's manager.[4] The Commonwealth argued that this resolution

---

[4] Resolution #14-2003, signed by Robinson Township Manager Timothy Little in 2003, stated as follows:

> BE IT RESOLVED, by the authority of the Board of Commissioners of the Township of Robinson, Allegheny County, and it is hereby resolved by authority of the same, that the Township Manager of said Municipality, authority be

demonstrated that the township's board of commissioners had both authorized its police to participate in the task force's activities and signaled that Sergeant Ogden would be present at all checkpoints. *See* Commonwealth's Motion to Reopen the Record and Admit New Evidence, 4/13/2015, ¶ 8.

Over Hlubin's objection, the trial court permitted the Commonwealth to admit the resolution into the record. N.T., 5/21/2015, at 13-15. It denied Hlubin's suppression motion and conducted a bench trial. Based upon the testimony from the suppression hearing and a lab report indicating a 0.152 blood alcohol content, the trial court found Hlubin guilty of two counts of DUI. *Id.* at 17-18, 23. The trial court sentenced Hlubin to thirty days of county intermediate punishment with eligibility for educational, medical, religious and work release, followed by six months of probation and a $750.00 fine.

Hlubin filed a notice of appeal to the Superior Court. In its written opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, the trial court concluded that the sobriety checkpoint at issue was authorized under both the ICA and

---

authorized and directed to sign the attached agreement on its behalf.

Further be resolved that the Township of Robinson shall participate with the West Hills DUI task force for the purpose of promoting safer highways in the Commonwealth by educating and enforcing driving under the influence of alcohol or drugs statutes.

I, Timothy Little, Township Manager of the Township of Robinson do hereby certify that the foregoing is a true and correct copy of the resolution adopted at the regular meeting of the Board of Commissioners held the 14 of July, 2003.

N.T., 5/21/2015, 13-14.

the MPJA. Trial Court Opinion, 1/5/2016, at 3-5. With respect to the ICA, the trial court found that, pursuant to resolution #14-2003, Robinson Township became a member of the task force and that Robinson Township and Moon Township were amongst its fifteen members. *Id.* at 6. As such, the sobriety checkpoint was a "valid exercise of a joint governmental cooperation agreement." *Id.* As for the MPJA, the trial court stated that Sergeant Ogden was in Robinson Township solely to participate in the operation of the checkpoint and that his presence had been specifically requested in the "sobriety checkpoint authorization form" signed by Chief Vietmeier of Robinson Township. *Id.* at 3, 6. According to the trial court, "[b]y requesting and authorizing the [task force] to operate a sobriety checkpoint, Chief Vietmeier was requesting aid or assistance from the other participating members of the [task force] to provide the manpower and experience necessary to operate the sobriety checkpoint." *Id.* at 6. As a result, this request for aid or assistance constituted a valid exercise of subsection 8953(a)(3) of the MPJA,[5] permitting Sergeant Ogden and the other officers at the checkpoint to cross municipal

---

[5] Pursuant to section 8953(a) of the MPJA:

> (a) General rule.—Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases:
>
> * * *
>
> (3) Where the officer has been requested to aid or assist any local, State or Federal law enforcement officer or park police officer or otherwise has probable cause to believe that the other officer is in need of aid or assistance.

42 Pa.C.S. § 8953(a)(3).

boundaries and conduct police-related operations outside of their primary jurisdictions. *Id.* at 6-7 (citing 42 Pa.C.S. § 8953(a)(3)).

A three-judge panel of the Superior Court affirmed, with one judge dissenting. *Commonwealth v. Hlubin*, 951 WDA 2015, 2016 WL 5874381 (Pa. Super. Oct. 6, 2016) (non-precedential) (withdrawn). Hlubin filed a petition for reargument en banc, which the Superior Court granted on December 15, 2016.

On May 23, 2017, the intermediate appellate court affirmed the trial court's decision. *Commonwealth v. Hlubin*, 165 A.3d 1 (Pa. Super. 2017) (en banc). It began by acknowledging (and agreeing with) the Commonwealth's concession that, contrary to the trial court's conclusion, the September 29, 2013 sobriety checkpoint did not comply with the ICA. *Id.* at 6. The ICA requires that that **every** participating municipality to a joint cooperation agreement must adopt an ordinance reflecting its entry into the agreement. *Id.* (citing 53 Pa.C.S. §§ 2303, 2305). Here, none of the fifteen townships or the City of Pittsburgh had adopted any such ordinance. *Id.* Therefore, according to the en banc panel, the trial court's reliance upon Robinson Township's resolution #14-2003 was misplaced, as it was not an ordinance and had not been adopted by the other task force municipalities.[6] *Id.*

The en banc panel also concluded that the lack of ICA compliance did not end its "inquiry with regard to whether the checkpoint was valid." *Id.* It held that the ICA and the MPJA are "not mutually exclusive," as they "address different circumstances that may

---

[6] Though not raised at the suppression hearing, we may take judicial notice that resolution #14-2003 was void. In 2010, Robinson Township enacted a new municipal code which provided that any prior actions by its governing body were nullified unless properly re-ratified (resolution #14-2003 was not).

arise within local municipalities." *Id.* It found that the ICA applies to "all local governments," whereas the MPJA applies to any "duly employed municipal police officer who is within the Commonwealth, but beyond the territorial limits of his primary jurisdiction." *Id.* The Superior Court then turned its attention to the question of whether the sobriety checkpoint was permitted pursuant to one of the MPJA exceptions.

Like the trial court, the en banc panel read subsection 8953(a)(3) of the MPJA as authorization for the participation of Sergeant Odgen and other officers in a sobriety checkpoint outside of their primary jurisdictions. It viewed the Robinson Township Police Chief's signed authorization as a request for "aid or assistance" to carry out the legitimate purpose of reducing DUI accidents and casualties in neighboring municipalities. *Id.* at 9. The court rejected Hlubin's contention that a request for aid or assistance under subsection (a)(3) must be contemporaneous with specific criminal activity, as it indicated that the subsection contains no language imposing a "contemporaneous element" into the subsection. *Id.* In a footnote, the court also recognized that subsection 8953(a)(4)[7] might also have provided authorization for Sergeant Ogden's participation, as the "sobriety checkpoint authorization form" signed by Chief Vietmeier constituted "consent to conduct official task force duties in Allegheny County." *Id.* at 7 n.9.

---

[7] Subsection 8953(a)(4) of the MPJA authorizes the performance of the functions of a police officer outside of his or her primary jurisdiction:

> (4) Where the officer has obtained the prior consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which provides primary police services to a political subdivision which is beyond that officer's primary jurisdiction to enter the other jurisdiction for the purpose of conducting official duties which arise from official matters within his primary jurisdiction.

42 Pa.C.S. § 8953(a)(4).

Finally, the en banc panel found that even if the checkpoint was not authorized under the MPJA, suppression was not warranted. It relied upon the test devised in *Commonwealth v. O'Shea*, 567 A.2d 1023 (Pa. 1989), which considers the intrusiveness of the police conduct, the extent of deviation from the letter and spirit of the MPJA, and the prejudice to the accused to determine whether suppression is warranted on a case-by-case basis. *Id.* at 9 (citing *O'Shea*, 567 A.2d at 1030). The en banc panel stated that the police conduct was not intrusive, as the detentions generally lasted only thirty to forty-five seconds and involved limited interactions; the checkpoint "furthered the purpose of the MPJA" by reducing DUI accidents and casualties; and finally, drivers stopped at the checkpoint suffered "minimal to no prejudice" from its operations. *Id.* The en banc panel thus affirmed the denial of suppression and the judgment of sentence.[8]

This Court granted allowance of appeal to consider the following questions:

1. Did the Superior Court erroneously broaden municipal police powers by holding that when municipal police officers leave their primary jurisdiction for the purpose of conducting sobriety checkpoints, it is not necessary to comply with the [ICA], by entering into written agreements and passing an ordinance because such actions are permitted under the [MPJA]?

2. Did the Superior Court erroneously eliminate the longstanding requirement that a "crime in progress" investigation must be taking place before police officers can leave their primary jurisdiction and enter into extraterritorial forays for the purpose of conducting an investigation under section 8953(a)(3) of the [MPJA]?

3. Did the Superior Court erroneously eliminate the statutory requirement in section 8953(a)(4) of the [MPJA], that before a police officer can enter another jurisdiction to conduct an

---

[8] In an issue not before this Court, the en banc panel also rejected Hlubin's challenge that her arrest was not supported by probable cause. *Hlubin*, 165 A.3d at 10.

investigation, the crime being investigated must have taken place in the officer's primary jurisdiction?

*Commonwealth v. Hlubin,* 174 A.3d 576 (Pa. 2017) (per curiam).

## I. The ICA and the MPJA

The questions presented for our review raise issues of statutory interpretation. As a result, our scope of review is plenary and the standard of review is de novo. *Commonwealth v. Popielarcheck,* 190 A.3d 1137, 1140 (Pa. 2018). We are guided in our analysis by the Statutory Construction Act, which provides in relevant part as follows:

§ 1921 Legislative intent controls.

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.

*       *       *

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

*       *       *

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

1 Pa.C.S. § 1921(a), (c).

The Pennsylvania Constitution defines a "municipality" as a "county, city, borough, incorporated town, township or any similar general purpose unit of government which shall hereafter be created by the General Assembly." Pa. Const. art. IX, § 14. By acts of its governing body, initiative, or referendum, a Pennsylvania municipality may agree, inter

alia, to cooperate with another municipality (or other governmental unit) with respect to any of its functions, powers, or responsibilities. Article IX, Section 5 provides:

> A municipality by act of its governing body may, or upon being required by initiative and referendum in the area affected shall, cooperate or agree in the exercise of any function, power or responsibility with, or delegate or transfer any function, power or responsibility to, one or more other governmental units including other municipalities or districts, the Federal government, any other state or its governmental units, or any newly created governmental unit.

Pa. Const., art IX, § 5.

The General Assembly, through its passage of the ICA, 53 Pa.C.S. §§ 2301–2317, established formal rules of compliance for intergovernmental cooperation. Section 2303 of the ICA authorizes said cooperation and provides that it shall be effectuated by joint agreements with the other governmental entities:

> § 2303. Intergovernmental cooperation authorized
>
> (a) General rule.--Two or more local governments in this Commonwealth may jointly cooperate, or any local government may jointly cooperate with any similar entities located in any other state, in the exercise or in the performance of their respective governmental functions, powers or responsibilities.
>
> (b) Joint agreements.--For the purpose of carrying the provisions of this subchapter into effect, the local governments or other entities so cooperating shall enter into any joint agreements as may be deemed appropriate for those purposes.

53 Pa.C.S. § 2303. Section 2305 further provides that any agreement for intergovernmental cooperation necessitates that the governing body of the municipality must pass an ordinance with respect to said agreement.

§ 2305. Ordinance

A local government may enter into intergovernmental cooperation with or delegate any functions, powers or responsibilities to another governmental unit or local government upon the passage of an ordinance by its governing body. If mandated by initiative and referendum in the area affected, the local government shall adopt such an ordinance.

53 Pa.C.S. § 2305. Any such ordinance must include seven specific items of agreement:

§ 2307. Content of ordinance

The ordinance adopted by the governing body of a local government entering into intergovernmental cooperation or delegating or transferring any functions, powers or responsibilities to another local government or to a council of governments, consortium or any other similar entity shall specify:

(1) The conditions of agreement in the case of cooperation with or delegation to other local governments, the Commonwealth, other states or the Federal Government.

(2) The duration of the term of the agreement.

(3) The purpose and objectives of the agreement, including the powers and scope of authority delegated in the agreement.

(4) The manner and extent of financing the agreement.

(5) The organizational structure necessary to implement the agreement.

(6) The manner in which real or personal property shall be acquired, managed, licensed or disposed of.

(7) That the entity created under this section shall be empowered to enter into contracts for policies of group insurance and employee

benefits, including Social Security, for its employees.

53 Pa.C.S. § 2307. Finally, a cooperation agreement is deemed to be in force (and enforceable) only after its adoption by ordinance by all of the cooperating governmental units. 53 Pa.C.S. § 2315.

Turning to the other statute at issue in this appeal, in *Commonwealth v. Merchant*, 595 A.2d 1135 (Pa. 1991), this Court recognized that the principal object of the MPJA is "the promotion of public safety while maintaining jurisdictional police lines." *Id.* at 1138. Section 8952 of the MPJA provides that a municipal police officer may perform the functions of his or her office anywhere within his or her primary jurisdiction[9]:

> § 8952. Primary municipal police jurisdiction
>
> > Any duly employed municipal police officer shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office anywhere within his primary jurisdiction as to:
> >
> > (1) Any offense which the officer views or otherwise has probable cause to believe was committed within his jurisdiction.
> >
> > (2) Any other event that occurs within his primary jurisdiction and which reasonably requires action on the part of the police in order to preserve, protect or defend persons or property or to otherwise maintain the peace and dignity of this Commonwealth.

42 Pa.C.S. § 8952.

---

[9] The MPJA defines "primary jurisdiction" as "[t]he geographical area within the territorial limits of a municipality or any lawful combination of municipalities which employs a municipal police officer[.]" 42 Pa.C.S. § 8951.

The MPJA previously included only one exception to police action outside of an officer's primary jurisdiction, namely where the officer was in hot pursuit of a fleeing suspect. Relevant to the present situation, it authorized a police officer to arrest any person beyond the territorial limits of his primary jurisdiction only when the officer continued in pursuit of such person after commission of a summary or other offense. 42 Pa.C.S. § 8901 (repealed).[10] In apparent response to decisions by our Superior Court that did not permit what appeared to be reasonable extraterritorial police actions outside of an officer's primary jurisdiction,[11] in 1982 the General Assembly added five additional exceptions. "Apparently, the General Assembly recognized that constructing impenetrable jurisdictional walls benefited only the criminals hidden in their shadows." *Merchant*, 595 A.2d at 1139. Section 8953(a) now provides, in relevant part:

> (a) General rule.--Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing

---

[10] Sometimes referred to as the "hot pursuit statute," the provision as enacted in 1963 provided the following:

> Any police officer in the employ of a county, city, borough, town or township may arrest, with or without a warrant, any felon beyond the territorial limits of the political subdivision employing such officer for a felony committed by the felon within the political subdivision employing the police officer if such officer continues in pursuit of the felon after commission of the felony.

Act of Aug. 6, 1963, P.L. 511, No. 267.

[11] See *Commonwealth v. Novick*, 438 A.2d 974, 975-76 (Pa. Super. 1981) (officer requested to assist in arresting burglary suspect seven blocks outside of his primary jurisdiction had no authority under hot pursuit statute or "mutual aid pact" to engage in extraterritorial police conduct); *Commonwealth v. Bable*, 385 A.2d 530, 531 (Pa. Super. 1978) (Greenville police officer responding to a radio call regarding a possible ongoing burglary at a store in a neighboring jurisdiction was not authorized to follow burglary suspect under hot pursuit statute because the officer had not entered Hempfield Township in pursuit of the suspect).

those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases:

(1) Where the officer is acting pursuant to an order issued by a court of record or an order issued by a district magistrate whose magisterial district is located within the judicial district wherein the officer's primary jurisdiction is situated, or where the officer is otherwise acting pursuant to the requirements of the Pennsylvania Rules of Criminal Procedure, except that the service of an arrest or search warrant shall require the consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which regularly provides primary police services in the municipality wherein the warrant is to be served.

(2) Where the officer is in hot pursuit of any person for any offense which was committed, or which he has probable cause to believe was committed, within his primary jurisdiction and for which offense the officer continues in fresh pursuit of the person after the commission of the offense.

(3) Where the officer has been requested to aid or assist any local, State or Federal law enforcement officer or park police officer or otherwise has probable cause to believe that the other officer is in need of aid or assistance.

(4) Where the officer has obtained the prior consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which provides primary police services to a political subdivision which is beyond that officer's primary jurisdiction to enter the other jurisdiction for the purpose of conducting official duties which arise from official matters within his primary jurisdiction.

(5) Where the officer is on official business and views an offense, or has probable cause to

believe that an offense has been committed, and makes a reasonable effort to identify himself as a police officer and which offense is a felony, misdemeanor, breach of the peace or other act which presents an immediate clear and present danger to persons or property.

(6) Where the officer views an offense which is a felony, or has probable cause to believe that an offense which is a felony has been committed, and makes a reasonable effort to identify himself as a police officer.

42 Pa.C.S. § 8953(a).  This Court has stressed that section 8953(a) extends the authority of police officers to exercise official police duties outside of their primary jurisdictions only in these six specific and limited circumstances.  *See, e.g.*, *Martin v. Commonwealth, Dept. of Transp., Bureau of Licensing*, 905 A.2d 438, 445-46 (Pa. 2006).  In addition, these exceptions must be interpreted consistently with the MPJA's "ultimate goal of maintaining police accountability to local authority."  *Merchant*, 595 A.2d at 1139.

As an initial matter, the Commonwealth concedes here, as it did before the Superior Court, that no agreement exists consistent with the ICA that authorized the activities of the task force in conducting sobriety checkpoints.  Nevertheless, the Superior Court's en banc panel held, and the Commonwealth argues here, that "neither the [t]ask [f]orce nor the Robinson Township Police Department should be penalized for failing to comply with the ICA" because the MPJA, rather than the ICA, governs extraterritorial policing.  *Hlubin*, 165 A.3d at 6; Commonwealth's Brief at 18.  Under this view, the ICA applies **generally** to agreements by local municipal governments for cooperation, but has no application to agreements dealing with cooperation between municipal police forces, as extraterritorial policing by municipal police officers falls under the **specific** dictates of the MPJA.  *Id.* at 19, 22 (citing *Hlubin*, 165 A.3d at 3).  The Commonwealth insists that

section 1933 of the Statutory Construction Act compels this conclusion. Section 1933 provides that where a "general provision in a statute" irreconcilably conflicts with a specific provision in the same or another statute, the specific provision shall be construed as an exception to the general provision unless the general provision was enacted later in time and reflects the manifest intention of the General Assembly that it shall prevail over the specific provision. 1 Pa.C.S. § 1933. The Commonwealth argues that with respect to extraterritorial policing, the ICA and the MPJA are irreconcilable and thus we must apply the specific statute (the MPJA) rather than the general statute (the ICA), as the MPJA was more recently amended. Commonwealth's Brief at 21.

Hlubin, by contrast, argues that municipal police officers may only leave their primary jurisdictions to participate in a sobriety checkpoint like the one at issue here upon an agreement under the ICA, because the responsibility of supervising police is a basic function of local municipal government. Hlubin's Brief at 17. In her view, municipal government officials, not police officers, must decide whether their municipal police officers should be deployed in other jurisdictions to conduct cooperative activities with other police forces, or should instead remain, to the extent possible, in their primary jurisdiction serving their own citizens. *Id.* at 25. According to Hlubin, such decisions are integral to maintaining police accountability to local authority, as they affect core functions for local governing bodies, including expenditures, allocation of personnel and liability issues. *Id.*

The Commonwealth's view requires an interpretation that policing is not a government function, but rather that decisions in this area are best left to police departments to make for themselves. Absent this interpretation, no irreconcilable conflict

exists between the ICA and the MPJA with respect to extraterritorial policing. The clear language of both statutes reflects that they apply in different circumstances. The ICA deals with durational agreements to permit municipalities to work together on a regular and ongoing basis over time. The MPJA, in contrast, deals with the authority of municipal police officers to respond as necessary to a specific criminal episode or an event that immediately threatens public safety. Any suggestion that the ICA does not require joint agreements between participating municipalities to permit ongoing cooperation between their police departments ignores the reality that one of the core "functions, powers and responsibilities" of local municipal governments is the provision of police services to their citizens.[12] 53 Pa.C.S. § 2303. When two or more municipalities decide to cooperate with each other in the provision of such services to their respective citizenry, an ICA agreement, adopted by ordinance by each of the member municipalities, is required. 53

---

[12] One clear example of the General Assembly's manifest intention in this context is its 2014 amendments to the Borough Code. As amended, the Borough Code requires that a borough council establish a police department and appoint officers, 8 Pa.C.S. § 1121(a), and further authorizes the borough council to enter into ICA agreements with other governmental entities to provide for "mutual aid or assistance" with other governmental entities for the provision of police services. In particular, the 2014 Borough Code empowers a borough:

> [t]o enter into agreements with other political subdivisions, in accordance with existing laws, … in carrying into effect provisions of 53 Pa.C.S. Ch. 23 Subch. A (relating to intergovernmental cooperation), and agreements with the proper authorities of municipal corporations, regional police or fire forces or other public safety or governmental entities created by two or more municipal corporations under 53 Pa.C.S. Ch. 23 Subch. A, either for mutual aid or assistance in police and fire protection or any other public safety services, or for the furnishing to or receiving from the municipal corporations or governmental entities police and fire protection or any other public safety services, and to make appropriations for public safety services.

8 Pa.C.S. § 1202(24).

Pa.C.S. § 2305. The ordinance of each municipal governing body must reflect its local control over the precise nature of the cooperation with the other municipalities, as it must include agreement with regard to duration, purposes and objectives, financing and the organizational structure necessary to implement the cooperation agreement. 53 Pa.C.S. § 2307.

Moreover, we note that neither the ICA nor the MPJA contains any language to demonstrate that the General Assembly considered there to be any conflict between them. To the contrary, section 8953(e) of the MPJA specifically references "cooperative police service agreements with another municipality."

> (e) Existing and future municipal police service agreements preserved.--Nothing in this section shall be construed to restrict the authority of any municipality to maintain current or to enter into new cooperative police service agreements with another municipality or municipalities for purposes including, but not limited to, describing conditions of mutual aid, assigning liability and determining appropriate costs of these cooperative efforts.

42 Pa.C.S. § 8953(e). The Commonwealth argues that this provision does not expressly reference the ICA, but the section as a whole clearly speaks to the authority of municipalities to enter into cooperation agreements with other municipalities of the type envisioned in the ICA. As described in this section, such "joint police service agreements" must include precisely the same information required of joint agreements under section 2307 of the ICA, including the nature and conditions of the cooperative relationship and the costs associated therewith. As such, section 8953(e) may fairly be read to indicate that cooperative relationships between municipalities with respect to the provision of police services require compliance with the ICA unless authorized by one of the six exceptions in section 8953(a).

The Commonwealth does not contest that the operations of the task force at issue here could have been authorized pursuant to an ICA agreement. The governing bodies of the fifteen municipalities and the City of Pittsburgh could have each passed ordinances reflecting their understanding and agreement to permit their municipal police officers to participate in sobriety checkpoints in other (non-primary) jurisdictions. Evidence presented at the suppression hearing demonstrated that the task force is an ongoing entity that has been in operation for many years and conducted between five and eleven checkpoints annually. N.T., 3/13/2015, at 57. The policies and procedures manual entered into evidence at the suppression hearing contains most, if not all, of the specific information required by section 2307 of the ICA, including the purposes and objectives of the task force, its principal funding mechanism, its organizational structure and the duties and responsibilities of each participating police officer. *Id.* at 17 (Commonwealth's Exhibit 1). This manual could have been converted into a qualifying ICA agreement and submitted to the governing bodies of each of the municipalities for adoption by ordinance. This did not occur. Instead, counsel for the Commonwealth represented at the suppression hearing that the task force was "set up between the police forces themselves." N.T., 3/13/2015, at 99.

Because the efforts of the task force that resulted in Hlubin's arrest and conviction were not authorized by the ICA, its participating non-Robinson Township police officers, including in particular Sergeant Ogden, had the authority to act outside the territorial limits of their primary jurisdictions only if an exception in the MPJA so provides. The Superior Court relied primarily on the exception in subsection 8953(a)(3) of the MPJA, which authorizes a municipal police officer to operate outside of his primary jurisdiction when

"the officer has been requested to aid or assist any local, State or Federal law enforcement officer or park police officer or otherwise has probable cause to believe that the other officer is in need of aid or assistance." 42 Pa.C.S. § 8953(a)(3). Hlubin submits that such request must be contemporaneous with some criminal activity, anchoring her argument in the subsection's reference to "probable cause." By contrast, the Superior Court and Commonwealth maintain that 8953(a)(3) authorizes a municipal police officer to cross jurisdictional boundaries upon any request for assistance by any other police officer without restriction. In other words, the Commonwealth would read the two clauses in subsection 8953(a)(3) as disjunctive, with only the second clause requiring any contemporaneous criminal activity to justify the provision of aid or assistance.

We agree with the Commonwealth that the two situations described in subsection 8953(a)(3) are "disjunctive" in the sense that they in fact describe two different circumstances. We disagree, however, to the extent that the Commonwealth intends to convey that the two situations do not need to be read together to give meaning to both. Instead, they are related to each other in that each imputes the element of probable cause. The first situation authorizes a municipal police officer to respond across jurisdictional lines to assist another officer who, in addressing specific ongoing criminal activity, requests aid or assistance.[13] The second situation allows extraterritorial policing

---

[13] In Hlubin's view, with which we agree, classic requests for aid or assistance encompassed by the first situation in subsection 8953(a)(3) involve calls over police radio from an officer seeking assistance in detaining a fleeing burglary or robbery suspect, such as in *Commonwealth v. Palagonia*, 868 A.2d 1212 (Pa. Super. 2005) (burglary) and *Commonwealth v. Peppers*, 515 A.2d 971 (Pa. Super. 1986) (robbery). Hlubin's Brief at 27-28. We further note that it authorizes extraterritorial policing in the circumstances involved in *Novick* and *Bable*, which, under the prior statute, were not encompassed by the hot pursuit exception. *See supra* n.11.

if a municipal police officer otherwise (i.e., other than by request) has probable cause to believe that the other officer is in need of aid or assistance in addressing a specific criminal episode. The General Assembly's use of the words "or otherwise" to describe the second situation compels this interpretation. Under the Commonwealth's preferred interpretation, the first situation broadly refers to any request for aid or assistance by an officer in another jurisdiction while the second situation is narrowly tailored to a circumstance where the officer has probable cause that the other officer is in need of aid or assistance. This interpretation, however, treats the word "otherwise" as unnecessary surplusage without any interpretative value. Our basic statutory construction principles forbid this practice. *See, e.g.*, 1 Pa.C.S. § 1921(a) ("Every statute shall be construed, if possible, to give effect to all its provisions."); *Reginelli v. Boggs*, 181 A.3d 293, 305 (Pa. 2018); *Burke by Burke v. Independence Blue Cross*, 171 A.3d 252, 260 (Pa. 2017). Giving meaning to the General Assembly's inclusion of the word "otherwise" necessitates that the reference to "probable cause" applies to both the first and second situations in the subsection – and thus to instances where aid and assistance is requested **or** where provided in response to a belief that another officer is in need of the same. The reference to "probable cause," in turn, connotes ongoing criminal activity or a crime in progress, as the term invokes the well-known legal standard applicable to the commission of criminal offenses. *See, e.g.*, *Commonwealth v. Burno*, 154 A.3d 764, 781 (Pa. 2017) (explaining that probable cause exists when "the facts and circumstances within the police officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.").

We further reject the Commonwealth's preferred interpretation of subsection 8953(a)(3) because it is entirely at odds with this Court's repeated insistence that the exceptions to the MPJA must not "adversely affect the ultimate goal of **maintaining police accountability to local authority**." *See, e.g., Merchant*, 595 A.2d at 1139 (emphasis added). The Commonwealth's interpretation, which would permit police officers to cross jurisdictional lines in response to any request for aid or assistance (including those unrelated to any particular criminal activity), is so broad that it essentially eliminates local governing bodies from the decision-making process with respect to the deployment of the police officers that they employ. If police departments may agree, without legislative approval by their local governing bodies, to commit their police officers to cooperative efforts with other police departments, then police departments, rather than local governing bodies, effectively exercise control over the municipality's expenditures, allocation of personnel, as well as exposing the municipality to a potential liability that may arise from the extra-jurisdictional activity. *Merchant* and our holding in this case recognize the limits of the specifically authorized extraterritorial policing and the place of intergovernmental agreements to effectuate broader arrangements for cooperation in policing functions. For these reasons, we conclude that subsection 8953(a)(3) does not authorize police officers to cross jurisdictional lines to participate in pre-arranged sobriety checkpoints.

The Superior Court also suggested that the exception in subsection 8953(a)(4) of the MPJA might also have authorized Sergeant Ogden's participation in the September 28, 2013 sobriety checkpoint at issue here. *Hlubin*, 165 A.3d at 7 n.9. That court reasoned that subsection 8953(a)(4) is applicable because Police Chief Vietmeier of

Robinson Township gave Sergeant Ogden his consent to participate in the sobriety checkpoint in Robinson Township "as a member of the Task Force executing a joint DUI checkpoint." *Id.* Pursuant to subsection 8953(a)(4), the police officer must have prior consent to enter the other jurisdiction from the chief law enforcement officer of the political subdivision which is beyond the police officer's primary jurisdiction "for the purpose of conducting official duties which arise from official matters within his primary jurisdiction." 42 Pa.C.S. § 8953(a)(4). We need not engage in any extended interpretative analysis of this exception, however, as it plainly cannot apply with respect to conducting sobriety checkpoints in another jurisdiction. Sergeant Ogden did not receive permission to enter Robinson Township to perform any "official duties" relating to any official matters arising "within his primary jurisdiction" of Moon Township. The record contains no evidence that Sergeant Ogden observed Hlubin driving while intoxicated in Moon Township and then obtained Chief Vietmeier's consent to enter into Robinson Township to effectuate her arrest. Simply put, Sergeant Ogden was not in Robinson Township to perform any police duties associated with any official matters that "arose in his primary jurisdiction."

The Superior Court erred in concluding that the exceptions in subsections 8953(a)(3) and/or 8953(a)(4) authorized any police officers, including Sergeant Odgen, to cross jurisdictional lines to participate in a sobriety checkpoint in Robinson Township. To conduct the type of sobriety checkpoint at issue in this case, a multi-jurisdictional task force must be authorized by a joint agreement that complies with the requirements of the ICA. Such compliance assures that DUI checkpoints allow police to generally promote public safety by removing intoxicated drivers from our roads, and ensures that the

governing bodies of the participating municipalities retain local control over their police forces.

## II. Remedy

Hlubin contends that suppression is the required remedy because the police officers conducting the sobriety checkpoint, including Sergeant Ogden, acted without any authority conferred by either an ICA agreement or the MPJA. Hlubin's Brief at 35. Following the rationale of the Superior Court, the Commonwealth instead argues that at most a "technical violation" of the MPJA occurred and that, accordingly, we should apply the three-part test set forth in *O'Shea*. Commonwealth's Brief at 45-48. The Commonwealth submits that Sergeant Ogden's brief detention of Hlubin was "more than reasonable" and non-prejudicial, and that as a result suppression is not warranted. *Id.*

In *O'Shea,* in the course of investigating a murder, City of Pittsburgh police detectives went to a suspect's home in another jurisdiction, Shaler Township. The detectives asked questions of the suspect's family and, with the family's consent, entered and searched the home. Shortly thereafter, the suspect arrived home and voluntarily accompanied the detectives to the Pittsburgh Public Safety Building, where he confessed to the murder. *O'Shea*, 567 A.2d at 1028-29. The suspect later contended that the detectives violated the MPJA when they pursued their investigation in Shaler Township. This Court disagreed and stated that the detectives' unobtrusive police conduct was "outside the scope of 8953" and thus "not illegal[.]" *Id.* at 1029. The Court concluded that while the detectives' entry into Shaler Township was not specifically authorized by any section 8953(a) exception to the MPJA, it was also not expressly prohibited by any of these exceptions. *Id.* To the contrary, the Court acknowledged that any private citizen

could do precisely what these detectives had done (go to Shaler Township to ask questions at the residence in question and search the home with consent), and thus indicated that "we will not prohibit police officers from doing that which a private citizen could do." *Id.* Accordingly, the *O'Shea* Court held that the detectives had not violated the MPJA or otherwise committed any constitutional violation whatsoever. *Id.* at 1029-30.

Having determined that the detectives did not lack statutory authority under the MPJA to enter Shaler Township, and that their search of the residence did not violate any provision of the Pennsylvania or United States Constitutions, the Court alternatively addressed the suppression court's rationale that even if the detectives had violated the MPJA, suppression was not required. *Id.* at 1030. Relying principally on *Commonwealth v. Mason*, 490 A.2d 421 (Pa. 1985), a case involving the extraterritorial service of an arrest warrant in violation of the Pennsylvania Rules of Criminal Procedure, the Court held that suppression was not required where "said violation did not implicate fundamental, constitutional concerns, was not conducted in bad faith or did not substantially prejudice the accused in the sense that the search would not otherwise have occurred or would not have been as intrusive." *Id.* at 1030 (citing *Mason*, 490 A.2d at 426). The *O'Shea* Court approved of a case-by-case three-factor test to determine the remedy for violations of the MPJA which considers "all of the circumstances of the case including the intrusiveness of the police conduct, the extent of deviation from the letter and spirit of the [MPJA], and the prejudice to the accused." *Id.*

In applying the *O'Shea* test in the present case, we reach a result contrary to that of the Superior Court, as we conclude that all three factors weigh in favor of suppression.

With respect to the test's first factor, the intrusiveness of the police conduct, *O'Shea*, 567 A.2d at 1030, the Superior Court pointed to Sergeant Ogden's testimony that stops at the task force's checkpoints "lasted only 30 to 45 seconds in length and involved officers first identifying themselves, asking for a driver's identifying documents (license, registration and insurance), and posing limited follow-up questions." *Hlubin*, 165 A.3d at 9 (citing N.T., 3/13/15, at 26–27). This testimony, however, is irrelevant to the application of the first *O'Shea* factor, as it describes only the level of intrusiveness (or lack thereof) of a checkpoint stop that does not result in any additional investigative measures, i.e., the driver is permitted to leave the checkpoint immediately after providing identifying documents and answering limited follow-up questions. In the sobriety checkpoint context, the first *O'Shea* factor must instead measure the level of intrusion of a stop that results in an arrest, since only in this circumstance does the issue of possible suppression of evidence arise. Here, based upon his initial questions and observations, Sergeant Ogden removed Hlubin from her vehicle and took her to a testing area, where she was subjected to field sobriety testing, blood testing and arrest. N.T., 3/13/15, at 33-34, 62-68. Without question, the interaction between Sergeant Ogden and Hlubin resulted in a high level of intrusiveness for Hlubin.

With respect to the second factor, the extent of deviation from the "letter and spirit of the [MPJA]," *O'Shea*, 567 A.2d at 1030, the Superior Court again erred in its analysis. The intermediate appellate court, citing to the task force's policies and procedures guidelines, stated that sobriety checkpoints "furthered the purpose of the MPJA by 'reduc[ing] the accidental death, injury and property-damage resulting from motor vehicle crashes involving intoxicated and chemically impaired operators ... decreas[ing] the

number of intoxicated and chemically impaired offenders on the highways of the member communities by conducting sobriety checkpoints.'" *Hlubin*, 165 A.3d at 9 (citing Ex. 1 at 2. While this may be a generally accurate statement of the purpose of sobriety checkpoints, it is not in any respect an accurate statement of the "letter and spirit of the [MPJA]."

In *Merchant*, this Court held that the goals of the MPJA are "the promotion of public safety while maintaining jurisdictional police lines" and to "expand the powers of local police to protect the public, where such expansion would not adversely affect the ultimate goal of maintaining police accountability to local authority." *Merchant*, 595 A.2d at 1139. The presence of municipal police officers from a large number of municipalities converging at a single location to conduct extraterritorial policing activities without the approval of the governing bodies of their respective townships, neither promotes the maintenance of jurisdictional lines nor preserves accountability to local authority. The MPJA allows extraterritorial policing only in "**six specific circumstances**." *Id.* (emphasis in original); *see also Commonwealth v. Ebersole*, 492 A.2d 436, 438 (Pa. Super. 1985) (stating that one of the purposes of the MPJA is "to provide police officers with authority to make arrests outside of their primary jurisdictions in **limited situations**.") (emphasis added). Where municipal police officers leave their primary jurisdictions to participate in task force activities on a regular basis in other jurisdictions, jurisdictional lines are not maintained but rather are obliterated. Moreover, as explained hereinabove, where this extraterritorial activity has no advance legislative approval or legal oversight, there is plainly no accountability to local authority.

The third factor requires consideration of the prejudice to the accused, which we defined in *O'Shea* to require consideration of whether "the search would not have otherwise occurred or would not have been as intrusive." *O'Shea*, 567 A.2d at 1030. On the current record, this factor also weighs in favor of suppression. Sergeant Ogden testified that the sobriety checkpoint that resulted in Hlubin's arrest required the participation of twenty-five police officers to conduct it. N.T., 3/13/2015, at 15. He did not indicate, however, how many extraterritorial officers were required to fill this quota on the night in question. As a result, on this record there is no way to determine whether the sobriety checkpoint operation at issue here could have been conducted at all without the participation of Sergeant Ogden and other extraterritorial officers. Accordingly, absent multiple violations of the MPJA, there may have been no sobriety checkpoint in Robinson Township on September 29, 2013 and thus no stop of Hlubin on that occasion. Moreover, the task force's policies and procedures manual provides that Sergeant Ogden, as the task force's grant coordinator, was required to be present at every sobriety checkpoint conducted by the task force. Commonwealth Exhibit 1 at 2 ("The Grant Coordinator shall be present to oversee every checkpoint operation… ."), and at 3 ("The Grant Coordinator will be present at all checkpoint operations… ."). As such, without Sergeant Ogden's unauthorized presence at the Robinson Township sobriety checkpoint, it could not have taken place and Hlubin would not have been stopped. The extraterritorial efforts of Sergeant Ogden, among others, were therefore prejudicial to Hlubin, as it is likely that there would not have been a sobriety checkpoint in Robinson Township to stop and arrest her, absent multiple violations of the MPJA. Thus, the analysis under the three-factor

*O'Shea* test leads to the suppression of the evidence derived from the illegal detention and arrest.

### III. Continued Vitality of *O'Shea*

We recognize that since our decision in *O'Shea*, the Superior Court has on several occasions applied *O'Shea*'s three-factor test to determine whether evidence obtained as a result of an MPJA violation should be suppressed. *See, e.g., Commonwealth v. Bergamasco*, 197 A.3d 805, 813 (Pa. Super. 2018); *Commonwealth v. Borovichka*, 18 A.3d 1242, 1250 (Pa. Super. 2011); *Commonwealth v. Hilliar*, 943 A.2d 984, 992 (Pa. Super. 2008); *Commonwealth v. Henry*, 943 A.2d 967, 973 (Pa. Super. 2008); *Commonwealth v. Peters*, 915 A.2d 1213, 1222 (Pa. Super. 2007); *Commonwealth v. Chernosky*, 874 A.2d 123, 129-30 (Pa. Super. 2005) (en banc); *Commonwealth v. McPeak*, 708 A.2d 1263, 1267 (Pa. Super. 1998); *Commonwealth v. Garnett*, 613 A.2d 569, 572 (Pa. Super. 1992); *Commonwealth v. Fetsick*, 572 A.2d 793, 797 (Pa. Super. 1990)..

While the parties to the present appeal have not asked this Court to overrule *O'Shea* and raise no arguments to suggest that it has been overruled by implication, for the reasons that follow, however, we are unwilling to expressly condone the continued application of its three-factor test.

First, we note that this Court has never again applied the *O'Shea* test in any subsequent suppression case involving a violation of the MPJA. More pointedly, in the one case to raise this issue since we decided *O'Shea* in 1989, *Commonwealth v. McCandless*, 648 A.2d 309 (Pa. 1994), this Court conspicuously did not apply it. In *McCandless*, after concluding that the police officer lacked any statutory authority to cross

a municipal boundary under subsection 8953(a)(2) of the MPJA to follow a driver on suspicion (but not probable cause) of speeding, this Court summarily reversed the Superior Court's decision that the evidence of speeding should not have been suppressed. *Id.* at 311 ("Appellant's motion to suppress was, therefore, properly granted by the lower court. In reversing, the Superior Court erred."). We did so without referencing the three-factor case-by-case test adopted in *O'Shea* to determine whether suppression is the appropriate remedy for violations of the MPJA. In dissent, then-Justice Castille protested that "the majority fails even to cite to *O'Shea*[,]" in "disregard of its reasoning … adopted only five years ago." *Id.* at 313 (Castille, J., dissenting).

Second, in cases decided since *McCandless*, this Court has consistently held that when individuals engage in criminal law enforcement activities without any statutory authority to do so, evidentiary suppression is the remedy for any and all breaches.[14]

---

[14] Contrary to Chief Justice Saylor's contention in his Concurring and Dissenting Opinion, the present Opinion does not "effectively overrule" the *O'Shea* test. That test was "effectively overruled" by our 1994 decision in *McCandless*, where, over the pointed objection of a dissenting Justice, we did not even mention it in a circumstance where its application would have been patently obvious if the test had any continuing vitality. We have not applied the test on a single occasion in the twenty-five years since *McCandless* was decided. Rote application of *O'Shea* under these circumstances would require that we turn a blind eye to our own precedent.

The reason for the Chief Justice's continuing attachment to the *O'Shea* test is not entirely clear, particularly given his call for statutory interpretation to resolve these jurisdictional issues. Concurring and Dissenting Op. at 2. The *O'Shea* test is a straightforward test of "good faith," measuring the degree of intrusiveness and extent of deviation from the MPJA against the resulting prejudice. As such, it is antithetical to the notion of interpreting the statutory language of the MPJA. Section 8952 provides municipal police officers with extensive powers to act within their primary jurisdiction, but section 8953 makes clear that these powers may only be exercised outside of the primary jurisdiction in circumstances where one of the six specific exceptions in section 8953(a) applies. *See infra* at 34-35. Rather than apply the unambiguous language of the MPJA, *O'Shea* allows courts to ignore the clear jurisdictional lines drawn by the General Assembly.

*Commonwealth v. Mathis*, 173 A.3d 699, 706-07 (Pa. 2017).[15]  In *Commonwealth v. Marconi*, 64 A.3d 1036 (Pa. 2013), for example, we held that sheriffs lack any statutory authority under the Motor Vehicle Code ("MVC") to conduct sobriety checkpoints, as section 6308(b) of the MVC limits authorization to conduct such activities to "police officers."  *Id.* at 1043-44.  Noting that the MVC defines "police officer" as a "natural person authorized by law to make arrests for violations of law," 75 Pa.C.S. § 102, and concluding that sheriffs' common-law peacekeeping powers did not satisfy this definition, we agreed with the Superior Court's decision to affirm the trial court's grant of suppression.  *Marconi*, 64 A.3d at 1044.

In other cases, we vacated the Superior Court's decision to deny suppression after we rejected a sheriff's claim of authority to conduct independent investigations pursuant to the Controlled Substance, Drug, Device and Cosmetic Act, *Commonwealth v. Dobbins*, 934 A.2d 1170 (Pa. 2007); we suppressed evidence obtained pursuant to a traffic arrest conducted by a constable after concluding that constables have no statutory authority to enforce motor vehicle laws, *Commonwealth v. Roose*, 710 A.2d 1129, 1130 (Pa. 1998); and similarly suppressed evidence after concluding that FBI agents lack any statutory authority to stop and arrest a motorist for MVC violations, *Commonwealth v. Price*, 672 A.2d 280 (Pa. 1996); *see also Kopko v. Miller*, 892 A.2d 766 (Pa. 2006) (explaining that sheriffs do not have criminal investigative and arrest authority relative to the Wiretapping

---

[15] In *Mathis*, the Court did not suppress evidence obtained pursuant to a *Terry* frisk of a non-offender by a parole agent during the course of his supervisory duties with regard to a parolee despite the lack of express authority to do so.  In so doing, however, we distinguished the situation in that case from the "lack of statutory authorization cases cited here, on the grounds that the *Terry* search was conducted solely for the safety of the agent and not for the discovery of evidence of crime or any exercise of criminal investigative powers."  *Id.* at 710.

and Electronic Surveillance Control Act). We know of no principled reason why we should treat the actions of municipal police officers lacking statutory authorized under the MPJA any differently than statutorily unauthorized actions of sheriffs, constables or FBI agents.

This Court has also addressed the propriety of the suspension of a driver's license where the evidence supporting the suspension was obtained as a result of a violation of the MPJA. In *Martin v. Commonwealth, Dept. of Transp., Bureau of Licensing*, 905 A.2d 438 (Pa. 2006), a municipal police officer, without any authority to do so under the MPJA, crossed a municipal line to follow a driver that he suspected (but lacked probable cause) of speeding. *Id.* at 439. After stopping the vehicle, the officer observed signs of intoxication and requested that the driver submit to field sobriety testing. *Id.* She refused and began to walk away, at which time the officer arrested her for DUI. *Id.* At a booking center, she refused to submit to chemical testing. *Id.* In reviewing the suspension of her driver's license under the Implied Consent Law, 75 Pa.C.S. § 1547, this Court agreed with the trial court that the officer lacked authority under the MPJA to pursue and arrest appellant in an adjoining jurisdiction. *Id.* at 446. Based upon this determination, we further concluded that the officer lacked the authority to implement the Implied Consent Law. *Id.* at 448. As a result, we ruled that the appropriate remedy was to reinstate the trial court's order invalidating the license suspension. *Id.*

In so ruling, we followed our prior decision in *McKinley v. Commonwealth, Dep't of Transp., Bureau of Driver Licensing*, 838 A.2d 700 (Pa. 2003), a case involving an extraterritorial stop by a corporal of the Harrisburg International Airport of a motorist he suspected of DUI. Upon determining that the encounter took place beyond the corporal's territorial jurisdiction, this Court invalidated the driver's license suspension. *Id.* at 706

(holding that "as the Legislature has circumscribed their police authority," the airport police lack "the ability to act as a police officer in the implementation of the Implied Consent Law outside territorial boundaries, in the absence of an express, legislative grant of extraterritorial authority").  With respect to our decisions in both *Martin* and *McKinley*, we recognize that suppression of evidence in the criminal context is not precisely on the same footing as the suspension of driver's licenses.  We perceive no good explanation, however, as to why, in circumstances in which statutory authority to act is lacking, the lenient standard for avoiding the remedy of suppression of evidence associated with criminal arrests under the *O'Shea* three-factor test (implicating the constitutional rights of the accused) would not have also applied to civil penalties under the Implied Consent Law if the *O'Shea* test had any continued vitality.

## IV.  Conclusion

Section 8952 of the MPJA provided Sergeant Ogden, as a municipal police officer, with extensive powers to act **within** his primary jurisdiction, including to "enforce the laws of this Commonwealth or otherwise perform the functions of that office" as to any offense which he viewed or otherwise had probable cause to believe was committed within his primary jurisdiction, or any other event that occurs within his primary jurisdiction to "preserve, protect or defend persons or property or to otherwise maintain the peace and dignity of this Commonwealth."  42 Pa.C.S. § 8952.  Section 8953(a) of the MPJA, however, limited his exercise of these powers **outside** of his primary jurisdiction to circumstances where he left his primary jurisdiction based upon one of the six specific exceptions set forth therein.  42 Pa.C.S. § 8953(a).  Section 8953(b) makes clear that the powers described in section 8952 may be exercised outside of a municipal police officer's

primary jurisdiction only where one of the six exceptions set forth in section 8953(a) applies. 42 Pa.C.S. § 8953(b) ("Nothing contained in subsection (a) shall be deemed to extend or otherwise enlarge a municipal police officer's power and authority to arrest any person for an offense unless specifically authorized by law.").

Based upon the clear language of these provisions of the MPJA and our conclusion that no exception in section 8953(a) applied here to permit Sergeant Ogden to leave his primary jurisdiction of Moon Township to participate in a sobriety checkpoint in Robinson Township, we must conclude that he lacked any authority to exercise the powers of a municipal police officer when he did so. On the night in question, Sergeant Ogden pulled Hlubin over and detained her. He requested her driver's license and questioned her. The Commonwealth does not contest that his actions constituted a detention and played a significant role in developing probable cause to arrest and charge her with DUI. Because the task force in which Sergeant Ogden was participating was not authorized by a joint agreement compliant with the ICA, and because his actions were not authorized pursuant to an exception under MPJA, all evidence gathered at the sobriety checkpoint against Hlubin must be suppressed.

The order of the Superior Court is hereby reversed.

Justices Todd and Wecht join the opinion in full, and Chief Justice Saylor and Justices Baer and Dougherty join Parts I and IV.

Chief Justice Saylor files a concurring and dissenting opinion in which Justices Baer and Dougherty join.

Justice Mundy files a dissenting opinion.