2019 PA Super 244

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| TERENCE DWIGHT FORSYTHE | |
| Appellee | No. 524 MDA 2016 |

Appeal from the Order Entered March 1, 2016
In the Court of Common Pleas of Lycoming County
Criminal Division at No(s): CP-41-CR-0001235-2015

BEFORE:  LAZARUS, J., STABILE, J., and DUBOW, J.

OPINION BY LAZARUS, J.:                    **FILED AUGUST 16, 2019**

This matter is before the Court on remand from the Pennsylvania Supreme Court for reconsideration in light of the Supreme Court's decision in **_Commonwealth v. Hlubin_**, 208 A.3d 1032 (Pa. 2019).  Upon review, we reverse the order granting Appellee's motion to suppress and remand for further proceedings.

The trial court summarized the relevant trial testimony as follows:

A. Detective Al Diaz's Testimony

Detective Al Diaz (Diaz) was a Lycoming County detective for seven years.  He was the coordinator of the Lycoming County Narcotics Enforcement Unit (NEU).  The NEU's function is to arrest people for drug violations in Lycoming County.  There are full-time and part-time members of the unit.  Part-time members help when the NEU requests.  Municipal police officers are part-time members of the NEU.  Each police officer submits an application to the NEU.  Each application is signed by the chief of police in the officer's jurisdiction.  Municipal police officers are paid by their

municipalities for their work in the NEU. The municipalities are reimbursed by the District Attorney's Office, [which] receives money from the Pennsylvania Attorney General's Office.

The NEU conducts interdiction roving patrols. [During these patrols,] law enforcement officers patrol areas where there is drug activity and attempt to stem the flow of drugs. "All those assigned [to a patrol] drive around looking for narcotics activity." If a police officer wants to stop a vehicle while on patrol, he or she has the authority to [do so]. . . . The NEU conducts interdiction patrols because there is "a really terrible drug problem in the county."

On June 3, 2015, the NEU conducted an interdiction roving patrol. In order to conduct the patrol, Diaz requested the aid of law enforcement officers [from] other departments. Sergeant Chris Kriner (Kriner) of the Old Lycoming Township Police Department was among those requested to aid in the patrol, which was set up by Detective Michael Simpler of the Lycoming County District Attorney's Office. The patrol included individuals from the Federal Bureau of Investigation, the Pennsylvania State Police, the Williamsport Bureau of Police, the Old Lycoming Township Police Department, the Pennsylvania Board of Probation and Parole, and the Lycoming County Probation Office. The officers were briefed before participating in the roving patrol. They were instructed to target certain areas. During briefings, Diaz sometimes [gave] the officers specific individuals to target, but he did not mention the Defendant or Cody Yearick (Yearick) during the June 3, 2015 briefing. After the June 3 briefing, "everyone went out to conduct investigations."

B. Sergeant Chris Kriner's Testimony

Sergeant Kriner has been a police officer with the Old Lycoming Township Police Department for 15 years. He has been a member of the NEU since 2001, and he has about 15 years of experience in conducting drug investigations. He assists members of the NEU in conducting drug investigations.

The NEU requested Kriner's assistance with a roving drug interdiction patrol that it was planning for [] June 3, 2015. He was assigned to the patrol "through the Old Lycoming Township Police Department." He was "made aware" of the date and time of the patrol and the location of the briefing. The briefing was

held on June 3, 2015 at approximately 3:00 p.m. in the conference room of the Old Lycoming Township Police Department, and the briefing lasted 30 to 45 minutes. Kriner was not given any specific information about the Defendant or Yearick during the briefing.

Kriner "went out" immediately after the briefing. He was in full uniform in an unmarked police vehicle with Chief William Solomon (Solomon) of the Old Lycoming Township Police Department. As part of the interdiction, Kriner is given general police powers throughout Lycoming County. He was patrolling the Interstate[-] 180 corridor, and he was looking for indications of drug use, buying, and dealing. Kriner's duties took him outside of his jurisdiction.

Shortly before 8:00 p.m. on June 3, 2015, Kriner was patrolling the area of the Weis Market on West Third Street in Williamsport. This area is not in the Old Lycoming Township Police Department's jurisdiction. Rather, it is in the jurisdiction of the Williamsport Bureau of Police. Based on the police reports and interviews with criminal defendants, Kriner believes the area is a high-crime area. He has received complaints of drug use and drug trafficking in the area. He has also made arrests for drug trafficking in the area.

As Kriner was driving through the Weis Market's parking lot, he saw a green Chevy Blazer parked in the lot. Two men quickly exited the vehicle and went into the store. Kriner checked for information on the vehicle and learned that it was registered to an individual with an address in Mifflinburg, Union County. From his training and experience, Kriner knows that [many] drug users go to Williamsport to purchase drugs. While the men were in the store, Kriner observed that the vehicle's windows were down, its keys were in the ignition, and cell phones were inside the vehicle. The men exited the store several minutes after they entered. They were looking around, and Kriner believed that they were looking for him and Solomon.

One man sat in the Blazer's driver seat; the other man sat in the passenger seat. When the vehicle exited the parking lot, Kriner began to follow it. Kriner thought it was "probable that [the men] may have been involved in drug activity." At the intersection of Market Street and West Third Street in Williamsport, it was apparent that the Blazer's license plate light was out. Kriner does not remember if the police car's headlights were on.

> The Blazer . . . proceeded east on Interstate 180.  Kriner followed the vehicle into Loyalsock Township, which is not in Old Lycoming Township Police Department's jurisdiction.  Kriner stopped the vehicle because the registration plate light was not operating. After the vehicle stopped, Kriner saw the passenger move around and twist his body.  Kriner talked with [Forsythe,] the vehicle's passenger[.]  Solomon talked with the driver, [] Yearick.  After talking with [Forsythe], Kriner talked with Yearick.  Based on the interviews of [Forsythe] and Yearick, [Forsythe] was taken into custody.  There were drugs "on [Forsythe]" and "drugs on Yearick."  Cell phones were seized from the vehicle.

Trial Court Opinion, 2/29/16, at 1-4.

Forsythe filed a motion to suppress, claiming that the stop of the vehicle was illegal because Sergeant Kriner lacked probable cause and that the stop violated the Municipal Police Jurisdiction Act ("MPJA").[1]  Following a hearing,

---

[1] 42 Pa.C.S.A. §§ 8951-8955.  The MPJA was enacted to "[promote] public safety while maintaining jurisdictional police lines."  **Hlubin**, 208 A.3d at 1040, quoting **Commonwealth v. Merchant**, 595 A.2d 1135, 1138 (Pa. 1991).  In addition to performing the functions of his or her office anywhere within his or her primary jurisdiction, section 8953 of the MPJA[1] provides six exceptions under which a police officer may perform extraterritorial police actions, one of which is relevant here:

> (a) General rule.--Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases:
>
> . . .
>
> (3) Where the officer has been requested to aid or assist any local, State or Federal law enforcement officer or park police officer or

the court granted, in part, Forsythe's motion to suppress.[2]    The Commonwealth appealed, arguing:  (1) the trial court abused its discretion in finding a violation of the MPJA; (2) the trial court erred in suppressing the evidence based on the alleged MPJA violation; and (3) the trial court abused its discretion in suppressing the observations of Sergeant Kriner and Chief Solomon.

This Court reversed the trial court's suppression order, concluding that Sergeant Kriner's actions did not violate the MPJA "[b]ased upon the liberal required reading of the MPJA and the existence of the Municipal Drug Task Force Agreement, as well as the specific request for assistance made by Detective Diaz[.]" **Commonwealth v. Forsythe**, 164 A.3d 1283, 1289 (Pa. Super. 2017) (withdrawn).

Forsythe filed a petition for allowance of appeal to our Supreme Court. By order dated July 2, 2019, the Court granted allowance of appeal, vacated our previous order, and remanded the case to this Court for further consideration in light of **Hlubin**.

_____

> otherwise has probable cause to believe that the other officer is in need of aid or assistance.

> . . .

42 Pa.C.S.A. § 8953(a)(3).

[2] The trial court ruled that the controlled substances, Forsythe's statements, the evidence obtained from the Blazer, and the officers' observations made on June 3, 2015 were to be suppressed, but ruled that the driver's proposed testimony could be submitted into evidence.  Suppression Order, 3/1/16, at 9.

In **Hlubin**, the defendant was stopped, questioned, and ultimately arrested for suspicion of driving under the influence ("DUI") at a sobriety checkpoint in Robinson Township. The checkpoint was conducted by a task force that included police officers from a number of municipalities operating outside of their primary jurisdictions. Hlubin's stop was itself conducted by an officer from outside the jurisdiction.

After being charged with two counts of DUI, Hlubin filed an omnibus pretrial motion seeking suppression of all evidence gathered during her detention at the checkpoint. She argued that the officer who performed the stop

> "was acting outside of his primary jurisdiction when he was operating a sobriety checkpoint in Robinson Township" and therefore, did not have the authority to conduct the stop and detention. Hlubin maintained that the task force did not comply with the [Intergovernmental Cooperation Act, 53 Pa.C.S.A. §§ 2301-2317 ("ICA")[3]] and that no exceptions set forth in the MPJA

_____

[3] The ICA established formal rules for intergovernmental cooperation. Section 2303 of the ICA authorizes such cooperation and provides that it shall be effectuated as follows:

> (a) General rule.--Two or more local governments in this Commonwealth may jointly cooperate, or any local government may jointly cooperate with any similar entities located in any other state, in the exercise or in the performance of their respective governmental functions, powers or responsibilities.

> (b) Joint agreements.--For the purpose of carrying the provisions of this subchapter into effect, the local governments or other entities so cooperating shall enter into any joint agreements as may be deemed appropriate for those purposes.

permitted members of the task force to operate outside of their primary jurisdiction.

*Hlubin*, 208 A.3d at 1035.

The Commonwealth asserted that the task force was in compliance with the ICA and, moreover, that the officer's presence at the checkpoint was authorized by certain exceptions in the MPJA that permit police actions outside an officer's primary jurisdiction. The trial court agreed, and denied Hlubin's suppression motion. She was subsequently tried and, after a bench trial, the court convicted her of two counts of DUI.

On appeal, a three-judge panel of this court affirmed Hlubin's judgment of sentence. Hlubin requested and was granted reargument en banc, after which this Court affirmed the trial court. In doing so, we held that, although the task force was not created in compliance with the ICA, it was nonetheless valid pursuant to section 8953(a)(3) of the MPJA, which, as then drafted, authorized extraterritorial police action where "the officer has been requested to aid or assist any local, State or Federal law enforcement officer or park police officer or otherwise has probable cause to believe that the other officer is in need of aid or assistance." 53 Pa.C.S.A. § 8953(a)(3). We further

_____

53 Pa.C.S.A. § 2303. Section 2305 of the ICA requires that the governing body of the municipality must pass an ordinance with respect to any agreement under section 2303. Any such ordinance must include seven specific terms of agreement. *See* 53 Pa.C.S.A. § 2307. Finally, a cooperation agreement is deemed to be in force only after its adoption by ordinance by all of the cooperating governmental units. *See* 53 Pa.C.S.A. § 2315.

concluded that, even if the task force had been in technical violation of the MPJA, suppression would not have been warranted under ***Commonwealth v. O'Shea***, 567 A.2d 1023 (Pa. 1990) (applying case-by-case approach considering intrusiveness of police conduct, extent of deviation from letter and spirit of MPJA and prejudice to accused to determine whether suppression is warranted).

Our Supreme Court granted allowance of appeal to consider three questions: (1) whether compliance with the ICA is necessary even when extraterritorial action is permitted under the MPJA; (2) whether, under section 8953(a)(3), a "crime in progress" investigation is a prerequisite to police officers leaving their primary jurisdiction to conduct an investigation; and (3) whether, under section 8953(a)(4), the crime being investigated must have taken place in the officer's primary jurisdiction before he can enter another jurisdiction to conduct an investigation.

The Court[4] began by addressing the interplay between the ICA and the MPJA as follows:

> The ICA deals with durational agreements to permit municipalities
> to work together on a regular and ongoing basis over time. The

---

[4] Justice Donohue delivered the Opinion of the Court as to the interpretation of the ICA and MPJA, as well as the ultimate remedy of suppression, in which she was joined by five of the remaining six justices. However, Chief Justice Saylor issued an opinion concurring in part and dissenting in part, in which he was joined by Justices Baer and Dougherty. In his dissent, Chief Justice Saylor disagreed with Justice Donohue's conclusion that ***O'Shea*** should effectively be overruled. However, because the relevant portions of Justice Donohue's Opinion garnered the support of six of the seven justices, her disposition is controlling as to those issues.

> MPJA, in contrast, deals with the authority of municipal police officers to respond as necessary to a specific criminal episode or an event that immediately threatens public safety. Any suggestion that the ICA does not require joint agreements between participating municipalities to permit ongoing cooperation between their police departments ignores the reality that one of the core "functions, powers and responsibilities" of local municipal governments is the provision of police services to their citizens. When two or more municipalities decide to cooperate with each other in the provision of such services to their respective citizenry, an ICA agreement, adopted by ordinance by each of the member municipalities, is required.

*Hlubin*, 208 A.3d at 1043.

However, Justice Donohue went on to note that, where extraterritorial police activity is not authorized by the ICA, it may still be valid if one of the exceptions under the MPJA applies. Because this Court had relied primarily on the exception contained in section 8953(a)(3), Justice Donohue began her analyisis with that section. Section 8953(a)(3) authorizes extraterritorial police action where "the officer has been requested to aid or assist any local, State or Federal law enforcement officer or park police officer <u>or</u> otherwise has probable cause to believe that the other officer is in need of aid or assistance." 42 Pa.C.S.A. § 8953(a)(3) (emphasis added). Hlubin argued that a request under subsection (a)(3) "must be contemporaneous with some criminal activity, anchoring her argument in the subsection's reference to 'probable cause.'" *Hlubin*, 208 A.3d at 1044. Conversely, the Commonwealth asserted that the two clauses in the subsection are to be read as disjunctive, with only the second clause requiring any contemporaneous criminal activity to justify the provision of extraterritorial aid or assistance.

While the Supreme Court "agree[d] with the Commonwealth that the two situations described in subsection 8953(a)(3) are 'disjunctive' in the sense that they in fact describe two different circumstances[,]" *id.* at 1045, nonetheless it found that "they are related to each other in that each imputes the element of probable cause." *Id.* The Court observed:

> Giving meaning to the General Assembly's inclusion of the word "otherwise" necessitates that the reference to "probable cause" applies to both the first and second situations in the subsection— and thus to instances where aid and assistance is requested or where provided in response to a belief that another officer is in need of the same.

*Id.*

The Court further concluded that the Commonwealth's interpretation of subsection 8953(a)(3) "is entirely at odds with [the] Court's repeated insistence that the exceptions to the MPJA must not 'adversely affect the ultimate goal of <u>maintaining police accountability to local authority</u>.'" *Id.*, quoting **Commonwealth v. Merchant**, 595 A.2d 1135, 1139 (Pa. 1991) (emphasis added in **Hlubin**).

> If police departments may agree, without legislative approval by their local governing bodies, to commit their police officers to cooperative efforts with other police departments, then police departments, rather than local governing bodies, effectively exercise control over the municipality's expenditures, allocation of personnel, as well as exposing the municipality to a potential liability that may arise from the extra-jurisdictional activity.

*Hlubin*, 208 A.3d at 1046. Thus, the Court concluded that subsection 8953(a)(3) "does not authorize police officers to cross jurisdictional lines to participate in pre-arranged sobriety checkpoints." *Id.*

Just over a month after the Supreme Court issued its decision in *Hlubin*, on July 2, 2019, the legislature amended, *inter alia*, section 8953(a)(3) of the MJPA, authorizing extraterritorial action by police officers, to read as follows:

(3) Where the officer:

(i) has been requested to aid or assist a Federal, State or local law enforcement officer or park police officer;

(ii) has probable cause to believe that a Federal, State or local law enforcement officer or park police officer is in need of aid or assistance; or

(iii) has been requested to participate in a Federal, State or local task force and participation has been approved by the police department of the municipality which employs the officer.

2019, July 2, P.L. ___, No. 58, § 1.1, imd. effective. The changes contained in this act were explicitly intended to reverse the Supreme Court's interpretation of the MPJA in *Hlubin*. The amendment to section 8953(a)(3) applies retroactively to law enforcement conduct on or after June 15, 1982. Accordingly, amended section 8953 controls the disposition of the instant matter.

In amending section 8953(a)(3), the legislature created a clear demarcation between the scenario in which aid is requested by another jurisdiction, and the circumstances under which probable cause is required as a condition precedent to extraterritorial police action. Applying the amended

language to the facts of the instant matter, it is readily apparent that the extraterritorial actions taken by Sergeant Kriner as a member of the interdiction roving patrol were consistent with the exception contained in new subsection 8953(a)(3)(i). Sergeant Kriner acted in direct response to a request from Detective Simpler of the Lycoming County District Attorney's Office and Detective Diaz, the coordinator of the Lycoming County NEU. Acting as a member of the NEU, Sergeant Kriner possessed general police power within the entirety of Lycoming County, Detective Diaz's jurisdiction. Accordingly, because Sergeant Kriner acted in compliance with the MPJA, as amended, the trial court erred in suppressing the evidence obtained as a result of Sergeant Kriner's investigation and vehicle stop.

Because we find that suppression was unwarranted, we need not reach the Commonwealth's remaining issues.

Order reversed. Case remanded for further proceedings consistent with the dictates of this Opinion. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 08/16/2019

- 12 -